[613 NYS2d 139]

VERA FORD, Individually and as Mother of TIMIA FORD, an Infant, Respondent, v DAVID GILDIN et al., Appellants, and 66 OVERLOOK TERRACE CORP., Respondent.

VERA FORD, Individually and as Mother of TIMIA FORD, an Infant, Plaintiff, v 66 OVERLOOK TERRACE CORP., Defendant and Third-Party Plaintiff, et al., Third-Party Defendant.

First Department, May 26, 1994

## APPEARANCES OF COUNSEL

*Robert H. Goldberg* of counsel, New York City *(Goldberg & Carlton,* attorneys), for appellants.

*Steven B. Prystowsky* of counsel, New York City *(Lester Schwab Katz & Dwyer,* attorneys), for 66 Overlook Terrace Corp., respondent.

## OPINION OF THE COURT

CARRO, J.

In 1955 Howard Taylor pleaded guilty to manslaughter and served five years in prison. In 1964 defendants David, Marcus and Leon Gildin, doing business as Fort Tryon Terrace Co., sued herein as Fort Terrace Co. (the Gildins), hired Taylor as a porter for the residential building they owned and managed, 66 Overlook Terrace, upon the recommendation of his brother, who was also their employee. The building was sold to the defendant 66 Overlook Terrace Corp. in March of 1984, and the Gildins relinquished management of the building in April 1985.

In 1967 plaintiff Vera Ford moved to 66 Overlook Terrace, where Taylor resided in a basement apartment. They became friends. In 1974, when Ford's daughter Timia was born, Taylor became her godfather and, as Timia grew, Taylor was a frequent presence in her life, often being permitted to watch the child unattended and have her visit him in his apartment. In 1987 it was discovered that Taylor was sexually abusing Timia, then 13 years old, and had been for some years prior, allegedly dating back to June 1982.

Plaintiffs brought suit against the Gildins and the successor landlord, essentially claiming negligence in hiring Taylor. The IAS Court denied the Gildins' motion for summary judgment, reasoning that "[t]he Gild[i]n defendants have not presented

evidence of what type of employment screening was performed, merely that Mr. Taylor was recommended for the porter's job by his brother and they were unaware of any problems. Whether this screening and Mr. Taylor's retention was reasonable under the circumstances is a factual question for the jury, see Haddock v City of New York, 75 NY2d 478 (1990)."

The *Haddock* case involved a negligence action against the City of New York arising from the rape of a child by a Parks Department employee who was retained in his employment at a playground after the City learned of his history of violent crimes, without complying with its own personnel procedures or exercising its discretion in retaining him. The Court of Appeals noted that the plaintiff had no viable action against the City for hiring its employee, which was mandated by law, and that issues of foreseeability and causation were not presented on the appeal (75 NY2d, *supra,* at 483). The Court held that "[t]he importance of employing former inmates, and reintegrating them into society, without risk of absolute liability for those who open doors to them, cannot be overstated. But even that worthy objective cannot excuse a municipal employer from compliance with its own procedures requiring informed discretion in the placement of individuals with criminal records" (75 NY2d, *supra,* at 485).

It is not here alleged that the Gildins failed to comply with their own procedures regarding employment of individuals with criminal records; nor does the record indicate that the Gildins had any such procedures. In *Amendolara v Macy's N. Y.* (19 AD2d 702 [1963]), which this Court decided shortly before Taylor was hired, we stated: "We find no evidence in the record from which a jury could reasonably infer negligence on the part of defendant Macy's New York in the hiring or supervision of Charters. It was under no duty to inquire into the possibility that Charters might have been convicted of a crime in the past, and before the incident in question nothing transpired to alert it to the possibility that such an incident might occur." While obviously the depth of inquiry prior to hiring, irrespective of convictions, may vary in reasonable proportion to the responsibilities of the proposed employment, we find no factual issue in this case regarding the Gildins' alleged negligence arising from their hiring Taylor as a porter.

"A party's liability for negligent acts or omissions extends to all injuries which are a foreseeable consequence thereof

provided that the negligent conduct was the proximate, or legal cause of the injuries sustained" *(Taieb v Hilton Hotels Corp.,* 131 AD2d 257, 262, *appeal dismissed* 72 NY2d 1040). Assuming, arguendo, that the Gildins' hiring of Taylor in 1964 was negligence, that negligence could not be found to be a proximate cause of the injury to the infant plaintiff some 18 years later *(see,* 79 NY Jur 2d, Negligence, § 52). The plaintiff mother's friendship with Taylor, his designation as Timia's godfather 10 years after he was hired, and Timia's unsupervised visits with Taylor which resulted from his closeness with the Ford family, were independent and unforeseeable intervening events which, taken together with the passage of 18 years from the time Taylor was hired until his wrongful acts against Timia, severed the causal nexus between the two events *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315). In addition, it was not foreseeable, as a matter of law, that a person who had committed manslaughter some time prior to 1955 would molest a child 27 years later. Were we to hold otherwise, then all ex-offenders who had ever committed a violent crime would be rendered virtually unemployable, for to hire them would render the employer liable for any criminal act committed thereafter, no matter how long the passage of time after the prior offense, and no matter how different the subsequent offense was from the earlier one.

In *Haddock v City of New York* (75 NY2d, *supra,* at 486), the Court of Appeals noted: "Particularly with respect to the employment of ex-convicts—who are officially free to walk the streets, visit the playgrounds, and live and work in society without being branded or segregated—the opportunity for gainful employment may spell the difference between recidivism and rehabilitation." Applying that policy to the instant case, even if the Gildins knew of Taylor's conviction for manslaughter before hiring him as a porter, the Gildins should not be subjected to liability, at the whim of a sympathetic jury, for criminal acts committed by Taylor approximately 27 years after his conviction and 18 years after he was hired.

We observe in this regard that Correction Law § 753 (1) (a) provides: "The public policy of this state, as expressed in this act, [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses." Correction Law § 752 prohibits an employer who has 10 or more employees from denying employment to a person on the basis of his having been convicted of one or more criminal offenses

unless "(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought; or (2) the issuance of the license or the granting of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public." *(See also,* Executive Law § 296 [15].)

In *Soto-Lopez v New York City Civ. Serv. Commn.* (713 F Supp 677 [SD NY 1989]) Judge Owen considered whether article 23-A of the Correction Law permitted the City to deny a position of housing caretaker to an applicant who had been convicted of manslaughter nine years previously. His cogent analysis of the issue demonstrates that the Gildins' hiring of Taylor was consistent with the law and public policy of this State (713 F Supp, *supra,* at 678-679):

"A job description of the housing caretaker position at issue lists as typical tasks sweeping and mopping public building spaces; spreading sand and salt; washing windows; changing light bulbs; gardening; and garbage collecting in public housing projects. Magistrate Dolinger accepted defendants' view that such activities would place Soto-Lopez in areas in which crime and violence frequently occur; therefore, given his criminal history, defendants could justifiably refuse to place him in a caretaker position. However, I cannot quite accept this view that the tasks involved in this position are either 'directly related' to a manslaughter conviction or present an unreasonable risk to persons or property, see [Correction Law] § 752.

" 'Direct relationship' is defined in § 750 (3) as one in which the 'nature of criminal conduct for which the person was convicted has a direct bearing on his fitness or ability to perform one or more of the duties or responsibilities necessarily related to the license or employment sought.' Since the housing caretaker position, unlike a correction officer position, for example, would not as such involve plaintiff in violent confrontations and obviously does not require plaintiff to carry arms, his fitness to perform these duties is not implicated. In assessing whether plaintiff's placement as a housing caretaker involves 'unreasonable risk' under the eight factors listed in § 753, *see Bonacorsa v. Van Lindt,* 71 N.Y.2d 605, 611-14, 528 N.Y.S.2d 519, 522-23, 523 N.E.2d 806, 809-10 (1988), the defendants would be exceeding their discretion in concluding that such unreasonable risk existed. Weighing the public policy in favor of employing ex-offenders against the other factors as the statute requires, I find that the specific duties and respon-

sibilities are not 'necessarily related to the license or employment sought.' In 1982, at the time plaintiff applied for the housing caretaker position, he had completed probation and his manslaughter conviction was approximately nine years old. Accordingly, I conclude that the city's refusal to hire him at this time would have been unlawful."

If in this case we were to allow that Taylor's conviction for manslaughter in 1955 could lawfully have stood as a bar to his employment as a porter in 1964, then we would be determining that Taylor could have been denied any employment for the more than 20 years that he worked for the Gildins until he was arrested for molesting Timia Ford. If we were to affirm the denial of the Gildins' motion for summary judgment we would be holding that the Gildins' employment of Taylor could be found by a jury to constitute negligence that was the proximate cause of foreseeable injuries sustained by Timia Ford. Such a precedent would effectively compel any employer to deny employment to anyone who was ever convicted of a violent crime, contrary to the public policy stated in article 23-A of the Correction Law, since the employer would upon such hiring face potentially catastrophic liability for any crime committed by that employee which was even minimally connected to the place of his employment.

We observe, finally, that Taylor's sexual assaults upon the infant plaintiff had nothing to do with his employment as a porter in the Gildins' building. Rather it was the circumstance that Taylor resided in the building that provided the setting for his friendship with Vera Ford, which in turn led to his becoming Timia's godfather and her being permitted to visit with him, unattended, in his apartment. Thus Taylor could just as easily have committed his assaults upon Timia if he had been a rent-paying tenant instead of living there as an adjunct to his employment as a porter. If the Gildins could be held liable for negligent hiring under these circumstances, then any landlord who rented an apartment to an ex-offender could arguably be held responsible for the tenant's crimes against his cotenants on a theory of "negligent renting." Thereafter landlords could only protect themselves from liability by refusing to lease living space to ex-convicts, who would then be rendered both unemployable and homeless.

Imposing liability upon an employer under the circumstances presented herein would have an unacceptably chilling effect on society's efforts to reintegrate ex-offenders into mainstream society, contrary to precedent and the explicitly stated

public policy of this State. As the Court of Appeals stated in a similar context:

"Consistent with his parole obligations, theoretically Campbell [the ex-offender] could have lived anywhere he chose, and otherwise enjoyed the rights of other citizens, including the right to be free of unfair discrimination by reason of prior arrests and imprisonment *(see, e.g.,* Correction Law art 23-A [employment of former inmates]; Executive Law § 296 [15], [16]). His release and return to society at the age of 33—presumably with a long life still ahead of him—were mandated by law as well as by public policy, which have as their objectives rehabilitating and reintegrating former inmates in the hope that they will spend their future years productively instead of returning to crime. * * *

"Consistent with conditions of parole, an individual returned to freedom can frequent places of public accommodation, secure employment, and if qualified become a student. On any other theory, former inmates cannot be returned to society without imposing on those who open doors to them the risk of absolute liability for their acts." *(Eiseman v State of New York,* 70 NY2d 175, 190-191.)

Accordingly the order of the Supreme Court, New York County (Harold Tompkins, J.), entered on or about September 14, 1993, which denied the motion by defendants David, Marcus and Leon Gildin, and Fort Tryon Terrace Co. for summary judgment dismissing the complaint, should be reversed, on the law, without costs, the motion granted, and the complaint dismissed as against the moving defendants.

SULLIVAN, J. P., NARDELLI and TOM, JJ., concur.

Order, Supreme Court, New York County, entered on or about September 14, 1993, which denied the motion by defendants-appellants for summary judgment dismissing the complaint, reversed, on the law, without costs, the motion granted, and the complaint dismissed as against the moving defendants.