Waterbury v New York City Ballet, Inc. (2022 NY Slip Op 02890)

BODY {
font-family : "Times New Roman", Times, serif;
font-size : larger;
}

P {
line-height: 150%;
text-indent: 2em
}

Waterbury v New York City Ballet, Inc.

2022 NY Slip Op 02890

Decided on April 28, 2022

Appellate Division, First Department

SINGH, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: April 28, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department
Judith Gische
Cynthia S. Kern David Friedman Jeffrey K. Oing Anil C. Singh


Index No. 158220/18 Appeal No. 15036 Case No. 2020-04225 

[*1]Alexandra Waterbury, Plaintiff-Respondent-Appellant,
vNew York City Ballet, Inc., et al., Defendants-Respondents, Jared Longhitano, et al., Defendants, Chase Finlay, Defendant-Appellant-Respondent.

Defendant Finlay appeals and plaintiff cross-appeals from an order of the Supreme Court, New York County (James Edward D'Auguste, J.), entered on or about September 28, 2020, which, insofar as appealed from as limited by the briefs, denied defendants' motions to dismiss the twelfth cause of action, for violation of Administrative Code of the City of New York § 10-180, as against defendant Chase Finlay, granted the motions as to the sixth and eighth causes of action, for assault, as against defendants Finlay and Amar Ramasar, the fifteenth, sixteenth, and nineteenth causes of action, for negligent infliction of emotional distress, intentional infliction of emotional distress, and invasion of privacy, as against Finlay, and the second cause of action, for negligent hiring and retention, as against defendant New York City Ballet, Inc. (NYCB); and denied Finlay's motion pursuant to CPLR 3024(b) to strike scandalous and prejudicial material from the complaint.

Brief Carmen & Kleiman, LLP, New York (Ira Kleiman of counsel), for appellant-respondent.
Hasapidis Law Offices, Scarsdale (Annette G. Hasapidis of counsel), for respondent-appellant.
Proskauer Rose LLP, New York (Kathleen M. McKenna and Rachel S. Fischer of counsel), for New York City Ballet, Inc., respondent.
Friedman Kaplan Seiler & Adelman LLP, New York (Lance J. Gotko of counsel), for Amar Ramasa, respondent.

SINGH, J.
We are asked on this appeal to address the scope and pleading standard of Administrative Code of City of NY § 10-180, which prohibits the disclosure of intimate images without the consent of their subject. Also at issue is whether plaintiff, Alexandra Waterbury, has sufficiently alleged that defendant New York City Ballet, Inc. (NYCB) knew of its employees' — principal ballet dancers' — harmful propensities, failed to take appropriate action, and caused her harm. At the motion to dismiss stage, we find that Waterbury has stated a cause of action for violation of the Administrative Code and for the negligent hiring and retention of defendant Chase Finlay as a principal dancer by NYCB.Factual Allegations
The complaint alleges that Waterbury is a former student at defendant School of American Ballet (SAB), the official school of NYCB. Finlay was employed as a principal at NYCB. Waterbury first met Finlay through NYCB. The two subsequently had an intimate relationship.
Defendants Amar Ramasar and Zach Catazaro were also employed as principals at NYCB. Defendant Jared Longhitano is a junior board member of NYCB, the founding junior board member of its Young Patrons Circle, and a member of its Young Patrons Host Committee.
In 2018, Finlay resigned, and NYCB suspended Ramasar and Catarazo.
NYCB Employees Allegedly Share Intimate Images Without Consent
The complaint further alleges that Waterbury did not consent to Finlay's taking or sharing intimate images of her with fellow employees of NYCB. Waterbury repeatedly rejected Finlay's efforts to film her. On or about [*2]May 15, 2018, Waterbury allegedly discovered that Finlay had secretly taken and shared photographs and videos of her, naked and often engaged in intimate activity.
Finlay shared the images of Waterbury with other NYCB employees, in particular other male principal dancers, during work hours and on work premises. Many of these images were accompanied by degrading commentary. The other male dancers, including Ramasar, encouraged Finlay to share these images. The exchange of these messages allegedly caused Waterbury severe emotional distress and ruined her reputation as a ballet dancer and model.Procedural History
Waterbury filed suit on September 4, 2018. On May 13, 2019, Waterbury filed her second amended complaint. All defendants moved pursuant to CPLR 3211 (a) (1) and (7) to dismiss the second amended complaint. Finlay also moved to strike scandalous or prejudicial material including allegations relating to photographs that do not depict Waterbury or to text messages unaccompanied by photographs, political or polemical statements, and references to crimes such as sexual abuse and assault.
Supreme Court dismissed all claims as against SAB and NYCB and individuals other than Finlay. The court also dismissed all claims as against Finlay except the twelfth cause of action, which alleges violations of Administrative Code § 10-180.
On appeal, Finlay argues that Supreme Court erred in failing to dismiss the twelfth cause of action and in denying his motion to strike scandalous or prejudicial matter. Waterbury argues that the court erred in dismissing her remaining claims against Finlay, her negligent hiring and supervision claim against NYCB, and her assault claim against Ramasar.Discussion
We must construe the pleadings liberally, take the complaint's allegations as true, and give Waterbury the benefit of every possible inference (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). Applying this well-settled standard, we find that Waterbury sufficiently pleaded a claim against Finlay for the unlawful disclosure of an intimate image, in violation of Administrative Code § 10-180. However, we find that the negligent hiring claim as against NYCB and the intentional infliction of emotional distress claim as against Finlay should have been sustained at this pleading stage.
Administrative Code § 10-180
Administrative Code § 10-180 (b) (1) provides:
"It is unlawful for a covered recipient to disclose an intimate image, without the depicted individual's consent, with the intent to cause economic, physical or substantial emotional harm to such depicted individual, where such depicted individual is or would be identifiable to another individual either from the intimate image or from the circumstances under which such image is disclosed."
Waterbury alleges that the images were disclosed without her consent. The plain meaning of section 10-180 prohibits disclosure of any intimate image without consent. Finlay argues that the prohibition applies [*3]only to images, unlike those at issue, that were taken with consent before being disclosed without it. There is no support for this argument in the statutory text. To the contrary, the law specifically covers one who obtains the image "through the recording of the intimate image," without specifying that the recording must be consensual (Administrative Code § 10-180 [a] [defining "covered recipient"]). The language of the statute is unambiguous; we should give effect to its plain meaning, without resorting to the legislative history, which is the sole basis for Finlay's argument (see Matter of Walsh v New York State Comptroller, 34 NY3d 520, 524 [2019]).
Waterbury alleges that she is a "depicted individual" shown in an "intimate image." For example, on September 3, 2017, Finlay allegedly sent a naked photograph of Waterbury. On October 9, 2017, Finlay shared explicit images of Waterbury. Finlay sent multiple photos of Waterbury, naked or performing a sexual act, to a former SAB student. Two of these were sent on May 2, 2018. On May 21, 2018, Finlay sent Ramasar images of plaintiff's bare breasts and of her performing a sexual act. On May 23, 2018, Finlay shared another picture of Waterbury with a former SAB student. Among the accompanying comments was Finlay's assertion, "I'm trying to get a sex tape with her cause I know that shot would sell."
These allegations state a claim for breach of section 10-180. Waterbury's allegations that images depict her engaged in sexual activity suffice (see Administrative Code § 10-180 [a] [defining "depicted individual"]). Construing the complaint liberally and according Waterbury "the benefit of every possible favorable inference" (EBC I, 5 NY3d at 19), the allegations that Finlay shared images of her breasts are also sufficient (see Administrative Code § 10-180 [a] [defining "intimate body parts"]). At least some of these images were sent after section 10-180 went into effect on December 17, 2017. Discovery may reveal more images sent after this time. Therefore, at this juncture, we do not need to decide whether the allegations of "naked" or "explicit" disclosed images would themselves state a cause of action in light of Waterbury's allegations that some disclosed images "depicted intimate body parts" as defined in section 10-180 [a].
Waterbury also sufficiently alleges that Finlay intended to cause her economic, physical, or substantial emotional harm. "A result is intended if the act is done with the purpose of accomplishing such a result or with knowledge that to a substantial certainty such a result will ensue" (Acevedo v Consolidated Edison Co. of N.Y., 189 AD2d 497, 501 [1st Dept 1993] [internal quotation marks omitted], lv dismissed 82 NY2d 748 [1993]). Waterbury alleges that Finlay knew she did not want him to take or share intimate images of her but that he did it anyway, and then shared the images with his friends, who were free to distribute the images further. Even assuming that secrecy would negate [*4]the intent to cause emotional harm, it is not clear as a matter of law that Finlay intended to keep the photos secret from Waterbury and the public. We note that some of the recipients are alleged to be influential in the world of professional ballet, with the ability to significantly affect Waterbury's career. At this pre-discovery stage, these allegations are sufficient to raise an inference of an intent to cause economic or substantial emotional harm (see Litwin v Hammond Hanlon Camp, LLC, 65 Misc 3d 1202[A], 2019 NY Slip Op 51475[U], *3 [Sup Ct, NY County 2019]).
Finally, section 10-180 is not preempted by the New York State Penal Law, at least as it relates to civil remedies. Finlay contends that Penal Law sections 250.45, 250.55, and 250.60 give rise to field preemption, which occurs when "the State has evidenced an intent to occupy an entire field through a pervasive scheme" (Engelman v Rofe, 194 AD3d 26, 30 [1st Dept 2021]). However, State law does not automatically preempt a private right of action created by the City (see id. at 31-32). Nothing in the cited sections of the Penal Law implies that the State intended to preclude civil recovery for dissemination of intimate images, whether or not prohibited by the Penal Law.
Negligent Hiring and Retention
The second cause of action, for negligent hiring and retention by NYCB, should also be sustained.
A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others (see Gonzalez v City of New York, 133 AD3d 65, 67-68 [1st Dept 2015]; Restatement [Second] of Agency § 213, Comment d). The cause of action does not need to be pleaded with specificity (Doe v Enlarged City Sch. Dist. of Middletown, 195 AD3d 595, 596 [2d Dept 2021]; see JG v Goldfinger, 161 AD3d 640, 641 [1st Dept 2018]).
The allegations are more than sufficient to support this claim. Specifically, Waterbury alleges that NYCB dancers and others affiliated with NYCB shared images and commentary regarding other women and that NYCB knew that Finlay and other dancers were degrading and exploiting young women. She asserts that NYCB implicitly encouraged this behavior. Waterbury states that NYCB knew of Finlay's sexual conduct towards young women and took no steps to prevent such conduct. She alleges, for example, that a group of dancers including Finlay were fined for hosting a party in Washington, D.C., at which they plied underage girls with drugs and alcohol. Rather than directing these dancers to stop, NYCB ordered them to limit this behavior to New York City. Significantly, defendant Longhitano — a junior board member of NYCB — allegedly participated in the exchange of demeaning text messages about female dancers. For example, Longhitano wrote to Finlay and Catazaro that "we should get like half a kilo and pour it over the ABT girls and just violate them. I bet we could [*5]tie some of them up and abuse them like farm animals." Finlay replied "or like the sluts they are." At this pre-answer stage, a board member's knowledge of communications with employees may be imputed to NYCB (see Fletcher v Dakota, Inc., 99 AD3d 43, 52 [1st Dept 2012]).[FN1]
The dissent misapprehends the law on a negligent hiring and retention claim. It ignores Waterbury's specific allegations that NYCB fostered a culture of exploiting young women by turning a blind eye to the harmful propensities of its principal dancers. Waterbury asserts that NYCB knew of, could foresee, and condoned Finlay's dissemination of images. It was foreseeable that Finlay, who — as NYCB allegedly knew — aggressively pursued young women and denigrated them in text messages with other NYCB dancers, would exchange intimate images of young women with those same dancers. On this pleadings motion, these allegations are sufficient to state a cause of action (see Doe v Intercontinental Hotels Group, PLC, 193 AD3d 410, 411 [1st Dept 2021]; Kerzhner v G4S Govt. Solutions, Inc., 138 AD3d 564, 565 [1st Dept 2016]; Enlarged City Sch. Dist. of Middletown, 195 AD3d at 596).
Liability for negligent hiring and retention does not require a special relationship between the defendant and the alleged victim (see Gonzalez, 133 AD3d at 72-73 [reversing summary judgment for the government on claims of police officer's murder of girlfriend]; Quiroz v Zottola, 96 AD3d 1035, 1037-1038 [2d Dept 2012] [reversing dismissal of claims by bus driver that the defendant negligently hired or supervised truck driver involved in traffic accident with the plaintiff]; Gray v Schenectady City School Dist., 86 AD3d 771,773-774 [3d Dept 2011] [affirming denial of motion to dismiss claims that the defendant's employee harassed and threatened the plaintiffs, one of whom had no relationship with the defendant]; Chuchuca v Chuchuca,67 AD3d 948, 950 [2d Dept 2009] [affirming denial of summary judgment against newspaper company by passenger in vehicle driven by the company's employee]). It is well established that the duty of care in supervising an employee extends to any person injured by the employee's misconduct (Sandra M. v St. Luke's Roosevelt Hosp. Ctr., 33 AD3d 875, 879 [2d Dept 2006]; see Gonzalez, 133 AD3d at 68-69; Restatement [Second] of Agency § 213, Comment d ["Liability results . . . not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment."]).
Nor need NYCB have benefited from or encouraged Finlay's conduct to be liable; if such conduct was a foreseeable outcome of his employment, NYCB had a duty to supervise that employment (see Sheila C. v Povich, 11 AD3d 120, 129 [1st Dept 2004]). To suggest otherwise is to conflate negligent hiring and supervision — that is, a defendant's own failure to prevent employees' independent wrongdoing that it is aware of — with vicarious liability for employees' [*6]acts on an employer's behalf. Liability for negligent hiring and retention is not limited to employees' actions within their scope of employment (Gonzalez, 133 AD3d at 67; Sheila C., 11 AD3d at 129).
Waterbury alleges a substantial nexus between NYCB's negligent supervision and the harm she suffered. The "nexus" requirement does not mean that the harm suffered must relate to the employer's business activities (see Gonzalez, 133 AD3d at 67 [stating that negligent hiring and retention applies when the wrong was neither within the scope of employee's duties nor in furtherance of the employer's interests]). Rather, it means that the employer's negligence must be a proximate cause of the plaintiff's injury (see id. at 67, 70, 71 [using "nexus" in connection with causation]; Ford v Gildin, 200 AD2d 224, 227 [1st Dept 1994] [finding no "causal nexus" between hiring decision and sexual abuse 18 years later, in plaintiff's apartment, outside of work hours]). For example, as the dissent emphasizes, one such nexus arises when an employee causes harm — however disconnected from work purposes — using an item provided by the employer (see e.g. Gonzalez, 133 AD3d at 70; Gray, 86 AD3d at774).
Similarly, courts have traditionally found such a nexus when an employer fails to prevent foreseeable harm in the workplace (see Restatement [Second] of Torts § 317 ["A master is under a duty to exercise reasonable care so to control his servant . . . as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if (a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using a chattel of the master."] [emphasis added]; id. Comment b ["A master is required to police his own premises . . . to the extent of using reasonable care to exercise his authority as a master in order to prevent his servant from doing harm to others."]).[FN2]
The dissent asserts that location alone cannot provide such a nexus. This argument ignores the impact of the work environment on employee behavior, the control that employers exercise over their business premises, and the responsibility that comes with such control. The dissent's speculation that Finlay would have shared the images wherever he worked is irrelevant.[FN3] The possibility that harm might have occurred if a defendant had not breached its duty does not negate liability for the harm that occurred because the defendant did breach its duty.[FN4]
The dissent's reliance on Timoshenko v Airport Auto Group, Inc. (95 AD3d 1299 [2d Dept 2012]) for this proposition is misplaced. The Second Department granted summary judgment to certain defendants because the shooting occurred "while [employee] was off-duty and away from [defendant's] premises" (id. at 1301). Although the employee's conduct in Timoshenko took place within physical property — not real property — owned by the employer, [*7]that property was not within the employer's control at the time. This is a fundamental difference from conduct committed in the workplace. In contrast here, at the motion to dismiss stage, Waterbury adequately alleges actual workplace misconduct by employees that the employer knew about and condoned.
In our view, if an employer knows that employees are using its property to injure others, especially during working hours, reasonable steps should be taken to prevent foreseeable harm. Any other outcome would give an employer carte blanche to ignore known employee workplace misconduct, however pervasive and persistent, so long as that misconduct was carried out on employees' personal devices. No case cited by the dissent supports this proposition. Indeed, the dissent does not cite a single First Department case dismissing a complaint for negligent hiring and retention where the harm was foreseeable to the employer. Such a holding would eviscerate the common-law duty we have traditionally imposed on an employer to take appropriate action when it has reason to know that an undue risk of harm exists because of its employee's harmful propensity (see Sheila C., 11 AD3d at 129 ["The negligence of the employer . . . arises from its having placed the employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in . . . the hiring and retention of the employee"]).
That harm that Waterbury alleges is not that she chose to have an intimate relationship with Finlay. Nor is it that Finlay took intimate images of her. The alleged harm is that Finlay shared those images without Waterbury's consent on NYCB premises, while present as an employee, with other NYCB employees. NYCB allegedly knew of this misconduct but chose to ignore it. This alleged violation of section 10-180 is the linchpin to Waterbury's negligent hiring and retention claim.[FN5] These allegations are more than sufficient to impose a duty of supervision on an employer, despite the dissent's contention that Finlay would have acted similarly wherever he was employed.
The dissent's statement that we are imposing "upon every employer a heretofore unknown duty to monitor the private behavior of its employees" is off the mark.[FN6] It is well settled that an employer owes a duty of reasonable care when it knows of an employee's harmful propensities. Rather, at issue here is whether the conduct alleged is sufficient to state a cause of action for negligent hiring and retention. We hold that it is.Remaining Claims
The sixteenth cause of action, for intentional infliction of emotional distress by Finlay, should be sustained. A plaintiff must allege extreme and outrageous conduct, intent to cause (or disregard of a substantial probability of causing) severe emotional distress, and actual distress resulting from the defendant's conduct (see generally Chanko v American Broadcasting Cos. Inc., 27 NY3d 46, 56 [2016]). We find [*8]that the alleged conduct — i.e., the repeated recording and dissemination of intimate images of Waterbury, without her knowledge or consent — is extreme and outrageous. Waterbury alleges that this conduct caused her severe emotional distress. She alleges facts supporting an inference, at the least, that Finlay disregarded a substantial probability of causing such distress. Although Finlay argues that this claim should be dismissed because the alleged misconduct "fall[s] within the ambit of other traditional tort liability" (quoting Hirschfeld v Daily News, 269 AD2d 248, 249 [1st Dept 2000]), he does not specify which other tort would apply.
The negligent infliction of emotional distress claim against Finlay, however, was properly dismissed. Generally, this cause of action requires that the plaintiff either be placed in physical danger or reasonably fear that she has been (Sheila C., 11 AD3d at 130). There is no allegation that Waterbury has been placed in physical danger. Her fear that she might some day be assaulted by some unknown person who has seen the images is not alleged in the complaint and, in any case, is not sufficient to support a cause of action.
Likewise, the assault claim against Finlay and Ramasar was properly dismissed. Assault requires an allegation of "intentional physical conduct placing the plaintiff in imminent apprehension of harmful contact" (Corcoran v City of New York, 186 AD3d 1151, 1151 [1st Dept 2020] [internal quotation marks omitted]). Even assuming that defendants' actions constitute physical conduct, which is dubious, Waterbury does not allege imminent apprehension of harmful contact. The fears that she now asserts are not alleged in the complaint. Moreover, the contact must be reasonably imminent (see Joon Song v MHM Sponsors Co., 176 AD3d 572, 573 [1st Dept 2019]; Okoli v Paul Hastings LLP, 117 AD3d 539, 540 [1st Dept 2014]). Whether measured from the time of defendants' conduct or Waterbury's discovery, any feared contact was not imminent (see e.g. Zheng v Rivera, 2014 NY Slip Op 33217[U], *4-5 [Sup Ct, NY County 2014] [threat inferred from text message was not imminent]; Naughright v Weiss, 826 F Supp 2d 676, 685 [SD NY 2011] [unknown conduct could not give rise to imminent apprehension]).
The invasion of privacy claim against Finlay was also properly dismissed. Although Waterbury alleges that Finlay said he was "trying to get a sex tape with her cause [he] kn[e]w that shot would sell," there is no claim that Finlay ever made such a tape. Waterbury does not allege that Finlay intended to sell any of the intimate images that he did take. There, Waterbury does not allege that Finlay used her images "for advertising purposes or for the purposes of trade" (see generally Molina v Phoenix Sound, 297 AD2d 595, 596-597 [1st Dept 2002], quoting Civil Rights Law § 51).
Motion to Strike
Finally, turning to Finlay's motion to strike scandalous and prejudicial material from the complaint, we find that most of the challenged [*9]allegations were properly sustained as relevant to his intent in disseminating the photos and to NYCB's knowledge of his propensity to do so (see generally Soumayah v Minnelli, 41 AD3d 390, 392 [1st Dept 2007], appeal withdrawn 9 NY3d 989 [2007]). The terms "assault," "battery," and "abuse" should be excised, however, because they are highly inflammatory and the corresponding claims have been dismissed. The allegations regarding Finlay's own substance abuse should also be stricken. Finlay's use of drugs or alcohol has no bearing on his intent with respect to the photos or his propensity to disseminate them (see Osvaldo D. v Rector Church Wardens & Vestrymen of Parish of Trinity Church of N.Y., 38 AD3d 480, 480-481 [1st Dept 2007]).Conclusion
Accordingly, the amended order of the Supreme Court, New York County (James Edward D'Auguste, J.), entered on or about September 28, 2020, which, insofar as appealed from as limited by the briefs, denied defendants' motions to dismiss the twelfth cause of action, for violation of Administrative Code of the City of New York § 10-180, as against defendant Chase Finlay, granted the motions as to the sixth and eighth causes of action, for assault, as against defendants Finlay and Amar Ramasar, the fifteenth, sixteenth, and nineteenth causes of action, for negligent infliction of emotional distress, intentional infliction of emotional distress, and invasion of privacy, as against Finlay, and the second cause of action, for negligent hiring and retention, as against defendant New York City Ballet, Inc. (NYCB); and denied Finlay's motion pursuant to CPLR 3024(b) to strike scandalous and prejudicial material from the complaint, should be modified, on the law, to deny the motions as to the intentional infliction of emotional distress claim against Finlay and the negligent hiring and retention claim against NYCB, to grant Finlay's motion to strike to the extent indicated, and otherwise affirmed, without costs.
All concur except Friedman, J. who dissents in part in a separate Opinion:

FRIEDMAN, J. (dissenting in part)


The alleged misconduct of the individual defendants — the surreptitious electronic dissemination of intimate photographic images made by defendant Chase Finlay of his former girlfriend, plaintiff Alexandra Waterbury — is outrageous and reprehensible, as well as actionable under the common law and under the New York City Administrative Code. On those points, there is no disagreement among the members of this bench. The sole issue on which the majority and I disagree is whether plaintiff alleges any cognizable ground for suit against defendant New York City Ballet, Inc. (NYCB), the cultural institution that, at the relevant time, employed Finlay and two other individual defendants as dancers, and with which the fourth individual defendant was affiliated as a "junior board member."[FN7]
The sole reason the majority gives for modifying Supreme Court's order to reinstate the complaint as against NYCB is that [*10]the individual defendants electronically shared the images while they were physically present on NYCB's premises for work or other legitimate organizational activities.[FN8] Critically, there is no allegation that the wrongdoing was perpetrated using NYCB's equipment or resources, whether computers, mobile phones, corporate email accounts, messaging networks or any other institutional asset. And, plainly, the reprehensible behavior alleged in the complaint was devoid of any corporate purpose, having been driven by the individual defendants' unworthy personal motivations. Nonetheless, for the majority, that this private online misconduct happened to have been perpetrated while the tortfeasors were present on NYCB's premises, combined with NYCB's alleged awareness of the existence of a crude "fraternity-like atmosphere" among its male dancers, suffices (if proven) to hold NYCB liable to plaintiff, on the theory that NYCB negligently hired, supervised or retained the employees in question. I disagree.
As the majority recognizes, to prevail on a claim against the employer of a tortfeasor for negligent hiring, supervision or retention, "what the plaintiff must demonstrate is a connection or nexus between the plaintiff's injuries and the [employer's] malfeasance" in negligently hiring, supervising or retaining the tortfeasor (Gonzalez v City of New York, 133 AD3d 65, 70 [1st Dept 2015] [emphasis added]). Stated otherwise, "The employer's negligence lies in his having placed the employee in a position to cause foreseeable harm, harm which would most probably have been spared the injured party had the employer taken reasonable care in making decisions respecting the hiring and retention of his employees" (Detone v Bullit Courier Serv., 140 AD2d 278, 279 [1st Dept 1988] [emphasis added], lv denied 73 NY2d 702 [1988]; see also e.g. Roe v Domestic & Foreign Missionary Socy. of the Prot. Episcopal Church, 198 AD3d 698, 701 [2d Dept 2021]; Sheila C. v Povich, 11 AD3d 120, 129 [1st Dept 2004]). For example, there were sufficient allegations that the defendant employer had "placed the employee in a position to cause foreseeable harm" (Detone, 140 AD2d at 279) in a case where the complaint alleged that a security guard employed by the defendant security company had sexually assaulted the plaintiff while she was staying at the hotel at which the guard was working and that the defendant security company knew or should have known of the guard's criminal propensities (Doe v Intercontinental Hotels Group, PLC, 193 AD3d 410 [1st Dept 2021]). Similarly, in Gonzalez, a triable issue existed as to the liability of the City of New York for an off-duty police officer's murder of his girlfriend because the officer was in possession of the gun that he used to commit the crime by reason of his employment as a police officer (see id., 133 AD3d at 68 ["The negligent retention or supervision of a police officer, which results in the employee having possession of a dangerous instrumentality[*11], is similar to if not indistinguishable from the tort of entrusting a dangerous instrumentality to another. . . . The duty not to entrust a gun to a dangerous or incompetent police officer thus extends to any person injured as a result of the negligent entrustment"]; id., 133 AD3d at 70 [the officer's "alleged tort was made possible through the use of his pistol, which he carried by authority of the City"]; see also Gray v Schenectady City School Dist., 86 AD3d 771, 774 [3d Dept 2011] [negligent supervision and retention claims were sufficiently pleaded against the defendant school district, based on the plaintiffs' allegations that a school district employee had "used defendant's computers, material and personnel to harass and intimidate them"]).
The complaint in this case, regardless of its allegations that NYCB could have foreseen the harm suffered by plaintiff, contains no allegations that NYCB "placed the employee[s] in a position to cause [that] foreseeable harm" (Detone, 140 AD2d at 279 [emphasis added]) or, stated otherwise, of "a connection or nexus between the plaintiff's injuries and the defendant's malfeasance" as employer of the direct wrongdoers (Gonzalez, 133 AD3d at 70). Unless the employer placed the employee in a position to cause the harm — which is an element distinct from the foreseeability of the employee's conduct causing the harm — the negligence of the employer (if any) in hiring, supervising or retaining the employee cannot have been a proximate cause of the harm (see Gray, 86 AD3d at 773 [noting that negligent supervision and retention claims "require allegations that the defendant knew or should have known of its employee's propensity to engage in the conduct that caused the plaintiff's injuries, and that the alleged negligent supervision or retention was a proximate cause of those injuries"] [emphasis added]). Thus, the employers in Intercontinental Hotels, Gonzalez and Gray were held to be potentially liable for negligent hiring, supervision or retention because, in each case, it was plainly alleged that the employer had placed its employee in a position to cause harm to a third party (in Intercontinental Hotels, by stationing the guard at the hotel; in Gonzalez, by entrusting the officer with a gun; in Gray, by giving the employee access to the computers and other means he used to commit the wrongdoing).
The majority identifies only one legally significant (in its view) nexus between plaintiff's injury (i.e., the electronic dissemination by the individual defendants of intimate images of her) and the individual defendants' employment by, or other affiliation with, NYCB. As previously noted, that supposed "nexus" is the alleged fact that the physical location from which the individual defendants electronically disseminated the images was the premises of NYCB. That connection, however, was entirely incidental to the tortious conduct, which could have been perpetrated from any physical location. Plainly, NYCB, by [*12]providing Finlay and the other individual defendants with a workplace, did not "place [them] in a position to cause" a harm that plaintiff "would most probably have been spared" (Detone, 140 AD2d at 279) had NYCB made different decisions about hiring, supervision and retention of its employees.
I am disturbed by the complaint's allegations of the crude and offensive repartee among the individual defendants and by the allegations of NYCB's failure to discipline its male dancers for various episodes of outrageous misbehavior.[FN9] Of course, these allegations must be assumed to be true for purposes of a pleadings motion, and, contrary to the majority's baseless accusation, I do not "ignore" them.[FN10] But even if NYCB was fully aware of the propensity of Finlay and the other individual defendants to engage in caddish and demeaning behavior toward young women, that awareness did not, by itself, create a nexus between NYCB's employment of the individual defendants and every tortious act those individuals might commit against a young woman. The foreseeability to the employer of an employee's private misconduct, standing alone, does not create a legal nexus between an employee's misconduct and the employment. NYCB can be held liable only for injuries caused by wrongdoing that was enabled or facilitated by NYCB's employment of the individual defendants. Further, the question is not whether NYCB had a "special duty" toward plaintiff; the question is whether NYCB's employment of Finlay somehow foreseeably enabled his misconduct.
At certain points in its opinion, the majority appears to concede that an employer cannot be held liable for an employee's misconduct in the absence of a causal connection between the employment and the plaintiff's injury.[FN11] At other points in the opinion, however, the majority conjures up the illusion of a causal connection between plaintiff's injury and NYCB's employment of the individual defendants by conflating the element of the foreseeability of the harm (and the troubling allegations pleaded to establish it) with the separate and distinct element of the employer's having placed the employee in a position to cause the harm. The instant complaint, liberally construed, alleges only the former element (foreseeability), but not the latter (nexus to the employment).[FN12] The conflation of these two elements, if generally accepted in our law, would result in the imposition of liability on an employer for any foreseeable wrongdoing of its employee, even if the wrongdoing was not facilitated by the employment in any way. This is the inescapable implication of the majority's unsupported assertion that "[t]he 'nexus' requirement [of a claim for negligent hiring] does not mean that the harm suffered must relate to the employer's business activities." Under this approach, an employer could be sued for any tort committed by the employee, in any facet of the employee's life, so long as the plaintiff was able to allege — under the liberal pleading rules [*13]invoked by the majority — that the employer could have foreseen the employee's commission of the tort.
Although the majority cites Gonzalez in support of its assertion that "the 'nexus' requirement does not mean that the harm suffered must relate to the employer's business activities," Gonzalez says only that an employer may be held liable under a negligence theory even if the employee committed a tort while "acting outside the scope of his or her employment" (133 AD3d at 67). Nothing in Gonzalez supports the outlandish position that liability may be imposed on the employer based on foreseeability alone, even if the harm does not "relate to the employer's business activities." Further, while the majority acknowledges that the negligence of the employer "must be a proximate cause of the plaintiff's injury" and consists in "having placed the employee in a position to cause foreseeable harm" (quoting Sheila C., 11 AD3d at 129), the majority nowhere explains how these conditions can be met in a case where "the harm suffered . . . [does] not relate to the employer's business activities." Indeed, it is an outright contradiction for the majority to say, on the one hand, that the harm "need not relate to the employer's business activities," and, on the other hand, that a claim of this kind does require a "nexus" between the employment and the harm. The words "nexus," "connection" and "relationship" are synonyms (see Doubleday Roget's Thesaurus in Dictionary Form, at 452 [Rev ed 1987]).
To distract from the utterly unreasonable implication of its position — that, under a theory of negligent hiring, supervision or retention, an employer may be held liable for any foreseeable tortious conduct of its employees, even if there is no causal nexus between the employment and the plaintiff's injury — the majority seizes upon the happenstance that NYCB's employees electronically shared the images of plaintiff — as previously noted, on their personal electronic devices — while they were (allegedly) physically present on NYCB's premises. This incidental connection between the tort and the tortfeasors' employment cannot bear the legal weight the majority places on it (see Nolechek v Gesuale, 46 NY2d 332, 341 [1978] [where the harm to the plaintiff was not "made any more probable, or any less probable," by the defendant's conduct, the defendant's conduct "was not a proximate cause" of the harm]). Unlike the employer's assignment of the predatory security guard to the hotel in Intercontinental Hotels, there was nothing about NYCB's premises that enabled or facilitated the tortious conduct alleged in this case. The images in question could just as easily have been electronically transmitted from a bar, an apartment, the street, or any other location. Moreover, the physical location of the individual defendants when they committed the tort is irrelevant to the harm plaintiff suffered; her injury would have been exactly the same, regardless of the physical location from which [*14]the images were transmitted. In sum, because the individual defendants' presence on NYCB's premises as NYCB employees did not make the harm to plaintiff "any more probable, or any less probable," their physical presence on NYCB's premises "was not a proximate cause" of plaintiff's harm (Nolechek, 46 NY2d at 341).[FN13]
In response to my observation that NYCB's premises do not constitute a causal nexus between the individual defendants' employment and their personal online misconduct, the majority accuses me of "ignor[ing] the impact of the work environment on employee behavior, the control that employers exercise over their business premises, and the responsibility that comes with such control." The majority here simply assumes what it purports to demonstrate, namely, that an employer has a legal duty to the general public (not just to those present on its premises) to regulate its adult employees' private conversations and the use of their personal electronic devices while they are at the workplace.[FN14] By the majority's reasoning, should an employee, while at the workplace, make an actionable statement to a coworker or transmit an actionable electronic message on his or her personal device — even if unrelated to the employer's business, and even if the person harmed has no connection to the employer — then the employer, too, may be sued, so long as the plaintiff alleges that the employee's wrongful communication was foreseeable because of the "work environment" the employer had permitted to develop. The majority cites no precedent supporting the imposition upon an employer of such a draconian duty to protect the entire world from private communications uttered by its employees while they happen to be at work. While I personally disapprove of the workplace culture alleged by plaintiff to have existed at NYCB, I do not think it appropriate for the majority to invent and impose on employers a duty to control their employees' private behavior in the workplace for the benefit of an unlimited class of outsiders (see Moch Co. v Rensselaer Water Co., 247 NY 160, 168 [1928] [Cardozo, Ch. J.] [an "enlargement of the zone of duty" by which "liability would be . . . indefinitely extended" is to be avoided]).
The majority wrongly suggests that I "conflate" plaintiff's negligence claim against NYCB with a vicarious liability claim under the doctrine of respondeat superior. I agree with the majority that the fact that the alleged wrongdoing against plaintiff was not committed by the individual defendants while "acting within the scope of the [their] duties or in furtherance of [their] employer's interests" (Gonzalez, 133 AD3d at 67) does not bar a claim against NYCB for negligent hiring, supervision or retention. As the majority stresses, a claim for negligent hiring, supervision or retention will lie against an employer where the employee's tortious acts were not committed within the scope of employment; by contrast, a claim for vicarious liability under the doctrine [*15]of respondeat superior (not asserted here) requires that the tort was committed by the employee in furtherance of the employer's interests (id.).
The deficiency in plaintiff's direct negligence claim is not that the individual defendants are not alleged to have acted within the scope of their employment (as we all agree they did not). The deficiency, rather, is that, assuming the truth of plaintiff's allegations, there is no causal nexus between the individual defendants' employment and plaintiff's injuries. As previously discussed, that the individual defendants allegedly happened to be standing in a NYCB building when they electronically transmitted the images in question was irrelevant to their ability to commit such wrongful acts and equally irrelevant to the harm plaintiff suffered. Nonetheless, the majority takes the position that NYCB somehow may be found to have had a legal obligation to step into its adult employees' private lives and stop their tortious private behavior, simply because the behavior was (allegedly) foreseeable. The majority cites no precedent for imposing such an expansive "duty of supervision" upon employers, in effect turning them into superintendents of their employees' love lives.
An employee's commission, while physically located within the employer's property, of a tort that is otherwise unrelated to the employer's business does not, standing alone, provide the nexus between the tort and the employment on which a claim against the employer for negligent hiring, supervision or retention must be predicated. Further, this is so even if the employer had reason to know of the employee's propensity to commit such a tort. In Timoshenko v Airport Auto Group, Inc. (95 AD3d 1299 [2d Dept 2012]), Bostic, a salesman employed by a car dealership (Airport Auto), was riding in one of Airport Auto's inventory vehicles when the vehicle was pulled over by the police. Bostic, from within the vehicle, shot and fatally wounded an approaching police officer during the stop (id., 95 AD3d at 1300). The Second Department dismissed the wrongful death action brought by the slain police officer's parents against Airport Auto, notwithstanding that, according to Supreme Court, Bostic "had multiple prior felony convictions, including two lengthy prison sentences for gun possession and robbery" (Timoshenko v Airport Auto Group, Inc., 32 Misc 3d 1229[A], 2011 NY Slip Op 51492[U], *3 [Sup Ct, Richmond County 2011], revd 95 AD3d 1299 [2d Dept 2012]). The Second Department held that, in spite of the involvement of Airport Auto's car in the incident, the connection between Bostic's murder of the officer and any negligence by Airport Auto in hiring, supervising or retaining him was too "attenuated" to support the imposition of liability (Timoshenko, 95 AD3d at 1301). Notably, there was no determination in Timoshenko that the employee's tort had not been foreseeable by the employer.[FN15]
I reiterate that plaintiff does not allege that any electronic equipment [*16]or resources of NYCB were used to disseminate the images. Had plaintiff made such an allegation, she might have stated a negligence claim against NYCB (see Gray, 86 AD3d at 774 [negligent supervision and retention claims were stated by the plaintiffs' allegations that the defendant's employee had "used defendant's computers, material and personnel to harass and intimidate them"]). In this case, however, even if it is assumed that plaintiff has sufficiently alleged that NYCB had reason to know of the individual defendants' tortious propensities, there is no allegation that NYCB "permitted [the individual defendants] continued access to the means to carry out [their] actions" (id.), as was alleged in Gray. In this regard, I agree with the majority's statement that, "if an employer knows that employees are using its property to injure others, . . . reasonable steps should be taken to prevent foreseeable harm" (emphasis added). That statement, however, does not describe the instant case. Someone who transmits messages on an electronic device while located within a building is not generally understood to be "using" the building to send the messages.
I do not understand why the majority finds it necessary to state that plaintiff's harm is neither "that she chose to have an intimate relationship with Finlay" nor "that Finlay took intimate images of her." Nothing I have written suggests otherwise. I am also puzzled by the majority's accusation that I am indulging in "speculation" by pointing out that the risk of Finlay's misconduct arose from his character and would have existed wherever he was employed.[FN16] Apparently, it is the majority's position that, to state a claim for negligence by NYCB in this matter, it is enough to allege that the individual defendants' wrongdoing was foreseeable and occurred while they were employed by NYCB, without alleging any facts drawing a proximate causal connection between the employment and plaintiff's harm, since whether the individual defendants would have done the same thing if employed elsewhere is (in the majority's view) a matter of speculation. I do not believe that New York law countenances this approach — under which any state of affairs existing at the time of an injury could be deemed to have been a legal cause of the injury — and the majority cites no authority suggesting that it does. In this regard, the majority chides me for "not cit[ing] a single First Department case dismissing a complaint for negligent hiring and retention where the harm was foreseeable to the employer" (Timoshenko having been decided by the Second Department). The majority, however, cites no case, from any court, sustaining a negligence claim against an employer where the employment of the direct tortfeasor and the harm to the plaintiff were so tenuously linked as they are here.[FN17] By no means do I deprecate the serious social problem of digital harassment, which the New York City Council addressed by enacting Administrative Code § 10-180[*17]. Section 10-180, however, imposes liability on the perpetrators of digital harassment, not on their employers. In extending liability to such an employer in this case, the majority imposes upon every employer a heretofore unknown duty to monitor the private behavior of its employees, even though that private behavior is not made possible, or even more likely, by the circumstances of the employment and bears only an incidental connection to the employment. I believe that the invention of this new duty will have a deleterious effect upon employers and employees alike. Given that there is no particularity requirement for pleading negligence claims, employers, to avoid becoming enmeshed in litigation under the majority's new standard of liability, will have no choice but to monitor their employee's use of their personal cell phones, tablets and other electronic devices while at the workplace. This will be a heavy burden upon employers, an Orwellian intrusion into the privacy of employees, and a further drag on an economy still emerging from the effects of the pandemic. Accordingly, while I otherwise concur with the majority's disposition of the appeal, I respectfully dissent to the extent the majority modifies to deny the motion to dismiss the complaint as against NYCB.
Order, Supreme Court, New York County (James Edward D'Auguste, J.), entered on or about September 28, 2020, modified, on the law, to deny the motions as to the intentional infliction of emotional distress claim against Finlay and the negligent hiring and retention claim against NYCB, to grant Finlay's motion to strike to the extent indicated, and otherwise affirmed, without costs.
Opinion by Singh, J. All concur except Friedman, J. who dissents in part in a separate Opinion.
Gische, J.P., Kern, Friedman, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: April 28, 2022
Footnotes

Footnote 1: At this juncture, we are required to accept the complaint's allegations as true and to draw every inference in Waterbury's favor (see EBC I, 5 NY3d at 19). We should not infer, as the dissent does, that a junior board member is significantly different from a board member.

Footnote 2: Because the Restatement is phrased in the disjunctive, it is applicable to intentional misconduct of any kind, as well as to unreasonably dangerous conduct. Only the second (conduct creating an unreasonable risk) is limited to bodily harm.

Footnote 3: Such speculation is particularly inappropriate here. The complaint does not allege that Finlay shared the images with the general population. Finlay is only alleged to have shared the images within the culture allegedly created by NYCB's negligence in hiring, retaining, and supervising its employees.

Footnote 4: Aside from being hypothetical, this argument cannot be reconciled with the theory of negligent hiring and retention. Liability for this tort requires that the employee possess (and the employer know of) a propensity to cause the harm at issue (Sheila C, 11 AD3d at 129-130). The risk of harm, in other words, necessarily arises from the employee's character.

Footnote 5: The dissent is wrong to suggest that we are imposing liability on NYCB under section 10-180. Negligent hiring and retention does not lead to vicarious liability. "The negligence of the employer in such a case is direct, not vicarious, and arises from its having placed the employee in a position to cause foreseeable harm" (Sheila C, 11 AD3d at 129).

Footnote 6: The dissent's concern that employers will be held liable for employees' online activity is overstated. Digital harassment is a pernicious issue in our society (see Elizabeth Brown, Protecting Does and Outing Mobsters: Recalibrating Anonymity Standards in Revenge Porn Proceedings,25 Duke J Gender L & Pol'y 155, 157-163 [2018] [discussing "revenge porn"];Emma Marshak, Note, Online Harassment: A Legislative Solution, 54 Harv J on Legis 503, 506-513 [2017] [discussing digital harassment generally]). These public policy concerns were considered by the City Council in passing section 10-180 (see Transcript of the Minutes of the Committee on Oversight and Investigation Jointly with Committee on Public Safety, November 15, 2017, at 4 ["The sharing of intimate content without one's consent is a traumatic experience for many victims, which can lead to an array of mental health effects as well as depression and suicide as well as the loss of employment."]).

Footnote 7: It appears from the record and briefs that the title of "junior board member" (which I do not recall ever before encountering) indicated that the defendant in question was a significant fundraiser or donor for NYCB. It is not alleged that the defendant who was a "junior board member" held any managerial authority within NYCB or over the other individual defendants, or that the "junior board" served any function similar to that of the NYCB's actual board of directors. I see no basis in the complaint or elsewhere in the record for the majority's apparent assumption that "a junior board member is [not] significantly different from a board member." The use in the complaint of the term "junior board member" can mean only that the defendant in question was not a member of NYCB's actual board of directors; were it otherwise, the word "junior" would serve no purpose. Notably, I have been unable to locate the word sequence "junior board" anywhere in the statutes of the State of New York.

Footnote 8: In reinstating the complaint as against NYCB, the majority correctly places no reliance on the fact that plaintiff had been a student at the ballet school affiliated with NYCB (defendant School of American Ballet [SAB]) before she became romantically involved with Finlay. Specifically, it is undisputed that plaintiff completed her studies at SAB in June 2016 and that she began her relationship with Finlay upon encountering him at a NYCB social function in September 2016. I note that Supreme Court dismissed the claim against SAB and, upon this appeal, plaintiff has abandoned that claim by failing to argue for its reinstatement in her briefs. The majority also correctly refrains from relying on the circumstances (1) that plaintiff first happened to meet Finlay while she was a student at SAB and he was a NYCB employee and (2) that the two became a couple upon encountering each other at the subsequent September 2016 NYCB social function. Plainly, an employer cannot be held liable to an employee's romantic partner for the employee's misconduct in the relationship simply because the relationship grew out of a meeting at the employer's place of business or at a gathering hosted by the employer.

Footnote 9: Disciplining employees for inappropriate conduct apparently is not as simple and straightforward a matter for NYCB as the majority assumes. While this information is outside the record, and does not affect my position on this appeal, it has been reported that, when NYCB terminated two of the individual defendants for their involvement in this matter, a grievance was filed on their behalf, and an arbitrator ultimately ruled that these two defendants were entitled to be reinstated (see Male Ballet Dancers Fired Over Explicit Photo Scandal Should Get Jobs Back: Arbitrator, New York Post, April 19, 2019).

Footnote 10: There is an internal contradiction in plaintiff's allegation, as summarized by the majority, that "NYCB fostered a culture of exploiting young women by turning a blind eye to the harmful propensities of its principal dancers." NYCB could either have affirmatively "fostered" the boorish and exploitive culture among its male principal dancers or "turn[ed] a blind eye" to that culture, but it could not have done both. In any event, for purposes of this appeal, I assume that plaintiff has sufficiently alleged that NYCB could have foreseen the misconduct of the individual defendants.

Footnote 11: For example, the majority correctly states: "[I]f [Finlay's] conduct was a foreseeable outcome of his employment, NYCB had a duty to supervise that employment" (emphasis added). Similarly, just before that statement, the majority quotes the following remark from the Restatement (Second) of Agency § 213, Comment d (1958): "Liability results . . . not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment" (emphasis added). In this case, assuming the truth of all of plaintiff's allegations, the harm plaintiff suffered at the hands of the individual defendants was not an "outcome of [their] employment," nor did the risk of that harm "exist because of [their] employment."

Footnote 12: According to the majority, the complaint alleges not only that NYCB could have foreseen the individual defendants' misconduct but that NYCB also actually "knew" of that misconduct. The only conceivable basis in the complaint for attributing such knowledge to NYCB appears to be the participation in the wrongdoing of defendant Jared Longhitano, the tortfeasor alleged to have been a "junior board member" at the time. However, as previously noted, the use of the term "junior board member" can mean only that Longhitano was not a member of NYCB's actual board of directors, and nothing in the complaint suggests that Longhitano held any managerial authority at NYCB. Further, even if Longhitano had been a member of NYCB's actual board, his knowledge of the wrongful image-dissemination cannot be imputed to NYCB, since this tortious activity obviously was not in furtherance of NYCB's corporate business (as the majority concedes).

Footnote 13: I do not agree with the majority's view that the allegations in this action fall within the scope of the duty articulated by Restatement (Second) of Torts § 317 (1965) ("A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment" but while the servant "is upon the premises in possession of the master"). As construed by the majority, section 317 would make an employer potentially liable for a defamatory personal email sent by an employee from the workplace during his lunch hour, on an electronic device owned by the employee. As I find this to be an unreasonable result, I understand the duty recognized by section 317 to be concerned with the prevention of harms that are "made . . . more probable" (Nolechek, 46 NY2d at 341) by the employee's presence on the employer's premises.

Footnote 14: I note that the majority's reference to "the impact of the work environment on employee behavior" could be read to suggest that an employer that allegedly has tolerated a bad "work environment" should be potentially liable for the private tortious behavior of its employees even when they are not at work. For example, if an employer can be held liable for any employee misconduct that might have been influenced by "the work environment," then a sports team permitting a crude and rowdy atmosphere in the locker room could be sued for harm caused by the misconduct of a player at a nightclub after a game. Presumably, however, such an audacious expansion of liability would be a step too far even for the majority.

Footnote 15: In attempting to distinguish Timoshenko on the ground that the employee's wrongdoing in that case did not occur on the employer's premises, the majority ignores the fact that the tort in Timoshenko bore the same relationship to the employer's car that the tort in this case bears to NYCB's premises — the employee's physical location when he committed the tort. Further, there is less than meets the eye to the majority's point that the car in Timoshenko "was not within the employer's control at the time" of the shooting. As a practical matter, an employer cannot control its employees' behavior every second they are at the workplace, as if the employees were robots.

Footnote 16: The majority itself acknowledges that "[t]he risk of harm . . . necessarily arises from the employee's character," but goes astray in taking the position that the only further prerequisite to imposing liability on the employer is that the employer "know of" the employee's "propensity to cause the harm at issue."

Footnote 17: I do not see the relevance of the majority's observation that "[t]he complaint does not allege that Finlay shared the images with the general population." Even if the images were shared only among persons affiliated with NYCB, plaintiff would still be required to allege and prove that the dissemination of the images was somehow enabled, facilitated or made more likely by NYCB's employment of the wrongdoers.